UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| DON FOWLER, | CASE NO. 1:21-CV-01708-BYP |
| Plaintiff, | JUDGE BENITA Y. PEARSON |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

## INTRODUCTION

Plaintiff Don Fowler filed a Complaint against the Commissioner of Social Security (Commissioner) seeking judicial review of the Commissioner's decision denying supplemental security income (SSI). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On September 7, 2021, pursuant to Local Rule 72.2, this matter was referred to me for preparation of a Report and Recommendation. (Non-document entry of September 2, 2021). Following review, and for the reasons stated below, I recommend the District Court **AFFIRM** the Commissioner's decision.

## PROCEDURAL BACKGROUND

Mr. Fowler filed for SSI on February 11, 2019, alleging a disability onset date of October 16, 2015. (Tr. 156, 284-91). His claims were denied initially and on reconsideration. (Tr. 155-68, 170-80). He then requested a hearing before an Administrative Law Judge. (Tr. 200-03). Mr.

Fowler was represented by counsel during portions of the application process, but counsel withdrew on March 30, 2020. (Tr. 219). Mr. Fowler did not appear for his scheduled hearing on June 26, 2020. (Tr. 150-54).

After rescheduling, Mr. Fowler (appearing *pro se*) and a vocational expert (VE) testified at a hearing before the ALJ on August 19, 2020. (Tr. 105-149). On August 27, 2020, the ALJ issued a written decision finding Mr. Fowler not disabled. (Tr. 85-104). The Appeals Council denied Mr. Fowler's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-6; *see* 20 C.F.R. §§ 416.1455, 416.1481). Mr. Fowler timely filed this action on September 2, 2021. (ECF #1).

FACTUAL BACKGROUND

## I.  PERSONAL AND VOCATIONAL EVIDENCE

Mr. Fowler was 47 years old at the time of his alleged onset date, and 52 years old at the time the application was filed. (Tr. 97, 169). Mr. Fowler completed twelfth grade, but did not graduate. (Tr. 116). In the past, Mr. Fowler has been employed as a corrections officer. (Tr. 97).

## II.  RELEVANT MEDICAL EVIDENCE[1]

**Physical Health.** An X-ray of Mr. Fowler's right shoulder from August 10, 2018 (interpreted by Seyed Hayeri-Meybodi, M.D.) indicated no acute fracture or malalignment; joint spaces were preserved; and soft tissues were unremarkable. (Tr. 439).

On December 13, 2018, Todd Stultz, M.D., interpreted CT scans of Mr. Fowler's cervical spine. (Tr. 446). Findings demonstrated advanced cervical spondylosis, with mild to moderate

---

[1]  Mr. Fowler submitted a Fact Sheet with his Merits Brief. (ECF #9-1). I therefore summarize the medical evidence he identified in his Fact Sheet as relevant.

diffuse AP narrowing of the cervical spinal canal and multilevel foraminal narrowing. (*Id.*).

Degenerative changes showed multilevel loss of disc height, endplate and uncinate osteophyte, and

facet degenerative change. (Tr. 481-82). There was severe foraminal narrowing at C5-C6 on the

right, and severe foraminal narrowing at C5-C6 and C6-C7 on the left. (*Id.*).

Notes from Anas AJ Minkara, M.D., on October 30, 2019, indicated Mr. Fowler had a

mildly antalgic gait secondary to pain. (Tr. 588). X-rays indicated Mr. Fowler's lumbar spine was

within normal limits. (Tr. 594). However, images from the right knee demonstrated a sclerotic area

with ill-defined margins and associated periosteal changes; further evaluation was needed to

exclude underlying tumor or neoplasm. (Tr. 588, 594).

On November 26, 2019, Lukas Nystrom, M.D., noted Mr. Fowler had reported right knee

pain for ten years, worsened over the course of three months. (*Id.*). Mr. Fowler was able to weight-

bear, but constantly felt a nagging pain in his right knee. (*Id.*). Dr. Nystrom noted osteoblastic

density in the proximal tibial metaphysis. (*Id.*). Dr. Nystrom indicated a differential diagnosis of

chronic stress fracture, metastatic disease from unknown source, lymphoma, and primary bone

sarcoma. (*Id.*). Dr. Nystrom recommended an MRI of the right knee and a whole-body bone scan.

(*Id.*).

On December 13, 2019, Mr. Fowler underwent a three-phase bone scan. (Tr. 630-31).

Abnormal findings were present in the right knee radiograph. (Tr. 630). The images demonstrated

mild focal hyperemia, a sclerotic lesion, and degenerative changes. (Tr. 630-31).

On January 9, 2020, an MRI of Mr. Fowler's right knee demonstrated a partially examined

ganglion cyst favored to be arising from a focal distal medial collateral ligament defect with

associated subjacent sclerotic changes in the medial tibia possibly related to chronic remodeling or post traumatic changes, and a patella alta with lateral patellar tilt. (Tr. 599-605).

**Mental Health.** Between November 6, 2019, and March 25, 2020, Mr. Fowler regularly received case management assistance, including mental health support, from Qiante Bolar, QMHS-B, and Aaron Ray. (*See* Tr. 540-58). At these visits, Mr. Fowler often met with them at his own residence and required assistance with housing, transportation, his SSI application, and making appointments with primary care. (*See, e.g.,* Tr. 542, 544, 546-47, 550, 561). He was diagnosed with schizoaffective disorder, depressive type, post-traumatic stress disorder (PTSD), and generalized anxiety disorder. (Tr. 551).

On November 6, 2019, Mr. Fowler met with Van Lawrence Porter, QMHS-M, who noted Mr. Fowler was in a calm mood and appropriately dressed. (Tr. 566). Mr. Fowler reported things were going well in treatment at Stella Maris. (*Id.*). However, Mr. Fowler was dwelling in self-pity and depression because his life was unmanageable. (*Id.*). Mr. Porter noted Mr. Fowler "left the visit with better perspective and insight to his growth and progress." (*Id.*).

On November 20, Mr. Porter noted Mr. Fowler presented with a low mood and depression, and indicated Mr. Fowler experienced hallucinations. (Tr. 568, 572-73).

On February 12, February 21, and March 24, 2020, Mr. Fowler met with Ms. Bolar, who noted that he presented as stable and was compliant with his medications. (Tr. 540, 542, 544). At the appointment on March 24, Mr. Fowler expressed going into a depression and wanting to have no contact with others. (Tr. 542; *see also* Tr. 78). He was scheduled for another appointment in two week. (*Id.*).

III.   MEDICAL OPINIONS

**Natalie Whitlow, Ph.D.** Dr. Whitlow performed a psychiatric evaluation of Mr. Fowler on May 15, 2019. (Tr. 513-22). Mr. Fowler presented in culturally appropriate attire that appeared dirty and poorly kept; he appeared to have neglected his personal hygiene and was disheveled. (Tr. 517). His speech and communication were rambling and at times was "incomprehensible." (Tr. 518). Dr. Fowler described multiple instances of rambling speech, and other odd behavior such as inappropriate laughter or jumping up to look at himself in the mirror and apply lotion to his face, or sudden and inconsolable crying episodes. (*See* Tr. 516-19).

Dr. Whitlow found Mr. Fowler appeared to be oriented to person, place, time, and event; however, he also did not state the correct year, he could not name the current president, nor did he understand the purpose of the evaluation. (Tr. 518). As for cognitive functioning, Dr. Whitlow assessed low average or below cognitive functioning; he could not answer the number of planets in the solar system, he stated there was one state in the United States, and he responded inappropriately to questions asking who the Reverend Dr. Martin Luther King, Jr. was, or the similarities between Abraham Lincoln and George Washington. (Tr. 518-19).

Dr. Whitlow diagnosed Mr. Fowler with unspecified schizophrenia and other psychotic disorder. (Tr. 519). She described that Mr. Fowler had a diagnosis of schizophrenia in 2015 but did not present sufficient evidence during the evaluation to confirm such a diagnosis more specifically. (*Id.*). Dr. Whitlow described Mr. Fowler's mental health prognosis as poor due to the severity, longevity, and increase in symptomology, with a reported inability to manage his symptomology effectively over time, as well as on the severe mental health signs he presented with during the evaluation. (Tr. 519-20).

Dr. Whitlow based her opinion on Mr. Fowler's self-report, her own personal observations, and the medical documentation submitted when filing his social security claim; she found the information was reliable. (Tr. 520). Mr. Fowler did not present with any obvious signs of paranoia or other psychosis, but he did present with mood and general instability that was "problematic" and outside of the normative range of functioning. (*Id.*). Dr. Whitlow described Mr. Fowler as having an affect that was "labile, erratic, and inappropriate," a presentation that was "erratic, odd, and bizarre," and thought processing and communication that was "problematic in that they were scattered, disorganized, vague, confusing, and difficult to make assessments from." (*Id.*).

In all, Dr. Whitlow opined Mr. Fowler's mental health symptoms cause "impairments with maintaining mood and generalized stability, functioning in an overall capacity, and effectively engaging in the work world." (Tr. 520). Dr. Whitlow described Mr. Fowler's functional assessment as follows:

| Dimension | Opined Limitation |
|---|---|
| **Understanding, remembering, and carrying out instructions** | "[Mr. Fowler] does not appear to have debilitating limitations with understanding or remembering instructions. . . . [he] appears to have limitations with carrying out instructions" due to general instability caused by his mental health symptoms. |
| **Maintaining attention and concentration, and in maintaining persistence and pace to perform simple and multi-step tasks** | [Mr. Fowler] experience[s] racing thoughts and paranoia that interfere with the clarity of his thought processing and district him from the here-and-now and serve to impair his ability to maintain attention and concentration and mental persistence. Additionally, his symptomology also causes him to experience states of general instability that impair his functioning, including his ability to follow through on and complete tasks. |

| Dimension | Opined Limitation |
|---|---|
| **Responding appropriately to supervision and coworkers in a work setting** | Mr. Fowler "does not appear to have debilitating limitations on this functional assessment area." However, Mr. Fowler's "odd and bizarre presentation that is outside of the normative range of functioning, as well as his paranoia, could interfere with his interpersonal functioning and ability to appropriately respond to supervisors and coworkers." |
| **Responding appropriately to work pressures in a work setting** | The claimant appears to have limitations on this functional assessment area, which is evidenced by his unspecified schizophrenia diagnosis that has accompanying symptoms that cause the claimant to experience affective, reality perception, and thought processing limitations that would diminish his ability to appropriately respond to work pressures related to attendance, professional presentation, reliability, task completion and productivity, and maintaining general stability. |

(Tr. 521-22).

**State Agency Consultants.** On June 15, 2019, Karla Delcour, Ph.D., assessed Mr. Fowler under Listing 12.03 (Schizophrenia Spectrum and Other Psychotic Disorders), but found insufficient evidence to assess his mental functioning. (Tr. 162-63). Dr. Delcour described Mr. Fowler as having "a consistent presentation which appears exaggerated and unsupported by actual treatment for the claimant's repeated complaints of psychosis." (Tr. 163). Dr. Delcour described Mr. Fowler as able to maintain relationships as evidenced by a friend bringing him to two of his consultative examinations. (*Id.*). In addition, Dr. Delcour described Mr. Fowler as "appear[ing] to give purposefully wrong answers" during the consultative examination with Dr. Whitlow, and that he under-reports or falsely reports his drug, alcohol, or prior criminal history. (*Id.*). "In short, his presentation should have an extensive documented mental health history with it." (*Id.*).

On July 5, 2019, Abraham Mikalov, M.D., provided a physical assessment of Mr. Fowler's residual functional capacity. (Tr. 163-66). Dr. Mikalov noted insufficient evidence to assess the severity of Mr. Fowler's conditions. (Tr. 163, 168). Even so, however, Dr. Mikalov determined limitations including occasionally lifting 50 pounds and frequently lifting 25 pounds, sitting, standing, and walking for six hours in an eight-hour day, and frequently climbing ladders, ropes, and scaffolds and stooping. (Tr. 165-66).

On September 18, 2019, Jennifer Swain, Psy.D., assessed Mr. Fowler's mental health record and also found insufficient evidence to assess his mental functioning. (Tr. 175-76).

On September 21, 2019, Steve McKee, M.D., also found insufficient evidence in the record to determine the current severity of Mr. Fowler's conditions. (Tr. 180). However, Mr. McKee made the same residual functional capacity assessment as Dr. Mikalov. (Tr. 176-78).

## IV. OTHER RELEVANT EVIDENCE

Evidence presented after the administrative hearing on August 19, 2020, includes the following.

**Physical Health Records.** Mr. Fowler underwent an examination on October 21, 2020, with Benjamin Langford, PA-C that showed tenderness to the cervical and upper thoracic paraspinal muscles. (Tr. 22-23). The examination PA Langford recommended alternating ice and heat, and provided Mr. Fowler with prescriptions for Lidoderm, naproxen, prednisone, and Zanaflex. (Tr. 22-23). PA Langford recommended following up with spine health, physical therapy, and a chiropractor if symptoms persist or worsen. (Tr. 23).

Anantha Reddy, M.D., examined Mr. Fowler on October 28, 2020. (Tr. 39). She noted a positive Spurling sign on the left, left arm triceps weakness, left wrist extension weakness,

8

brachioradialis weakness, and an absent left upper extremity reflex. (*Id.*). Provisional diagnosis was acute left cervical radiculopathy at C6/7 with left arm weakness, numbness, and mechanical low back pain. (*Id.*). Dr. Reddy recommended no chiropractic adjustments. (*Id.*).

An X-ray of Mr. Fowler's cervical spine on October 28, 2020, showed moderate narrowing of C4-C5 and C5-C6 disc spaces with endplate osteophytes; mild narrowing of C3-C4 disc space; no compression fracture or subluxation; and mild narrowing of the neural foramina at C4-C7. (Tr. 33). X-rays of the lumbosacral junction showed mild narrowing of the L5-S1 disc space suggestive of degenerative disc disease. (Tr. 35). The examination was interpreted by Hakan Ilaslan, M.D. (*Id.*).

On November 4, 2020, Mr. Fowler presented to the Cleveland Clinic emergency department complaining of neck and thoracic back pain with radiation to his left arm. (Tr. 24). Notes indicate Mr. Fowler had previously been seen in the emergency department. (*Id.*). Mr. Fowler had muscle X-rays and was on steroids and anti-inflammatories, without improvement. (*Id.*). Examination was positive for back and neck pain, and 2+ radial pulses bilaterally, but negative for arthralgias and myalgias. (Tr. 24-25). Mr. Fowler exhibited tenderness, pain, and decreased strength due to pain, but normal range of motion and no swelling, effusion, crepitus, or spasm. (*Id.*). On the same day, Mr. Fowler had an X-ray of his left shoulder that demonstrated left acromioclavicular joint arthrosis but no acute bony abnormality. (Tr. 15). Mr. Fowler was counseled by Andrew Sasak, PA-C on his X-ray results; PA Sasak discontinued Mr. Fowler's previous medications and recommended completing his steroid taper because they were not effective. (Tr. 27). PA Sasak discharged Mr. Fowler with prescriptions for Mobic, Voltaren topical gel, and Norflex. (*Id.*).

**Mental Health Records.** Records from March 24 through December 1, 2020, were submitted from Centers for Families and Children. (Tr. 41-79). Notes from December 1, 2020, indicated Mr. Fowler takes aripiprazole (Abilify) and hydroxyzine HCL (Atarax) for his mental health conditions, prescribed by Shaina Allen, APRN, CNP. (Tr. 48-50).

Mr. Fowler regularly met with Ms. Bolar (including on May 20, June 17 and 23, July 10, September 22, November 6, and 10, 2020), who noted Mr. Fowler was stable and compliant with his medication. (Tr. 52, 54-55, 57-60, 66, 70-74). Ms. Bolar also often assisted Mr. Fowler with housing, safety, and his mental health. (*Id.*).

Notes from May 20, 2020 indicate Mr. Fowler was compliant with his medication, but Ms. Bolar also described Mr. Fowler as not always taking his prescribed medication daily due to stomachache. (Tr. 74). Notes from September 4, 2020, indicate Mr. Fowler was not compliant with his medication, but he did present as stable during this visit. (Tr. 56).

## V.    ADMINISTRATIVE HEARING

The following summarizes the testimony of Mr. Fowler and VE Paula Zinsmeister, presented during the hearing before the ALJ.

Because Mr. Fowler appeared at the hearing without counsel or another representative, the ALJ presented Mr. Fowler with information on his rights to proceed with or without representation, and the types of assistance and cost involved with seeking representation. (Tr. 109-112). Having been informed of his rights, Mr. Fowler waived his right to representation and elected to proceed *pro se*. (Tr. 111-12).

Mr. Fowler lives with a friend who he has known for a long time. (Tr. 114). Mr. Fowler used to have a driver's license but does not drive due to his mental health issues. (Tr. 115). He

typically travels on public transportation or has a family member drive him. (Tr. 115-16). He attended school through twelfth grade but did not graduate or obtain a GED. (Tr. 116). His friend helps him with his hygiene. (Tr. 125). His friend takes care of most chores, but Mr. Fowler will sometimes sweep the floors, depending on how he is feeling that day. (Tr. 127-28). He does not use the internet. (Tr. 127).

Mr. Fowler previously worked as a corrections officer at Cuyahoga Reentry Agency in 2007-2008 and at Community Assessment and Treatment in 2013. (Tr. 117). In his most recent position, Mr. Fowler was required to monitor the people who came in with drug addictions; both in-person and on a video monitor. (Tr. 117-18). He was on his feet six out of eight hours per day and was required to lift up to twenty pounds. (Tr. 118). He performed similar work as a monitor at Cuyahoga Reentry Agency but was required to be on his feet the entire time. (*Id.*). He would conduct rounds of the facility every twenty minutes to ensure safety and make sure patients were not using or abusing drugs. (Tr. 119). He also was responsible for logging and checking patients in, conducting urinalysis and breathalyzer tests, and ensuring weapons were not carried into the facility. (Tr. 120). Mr. Fowler described going "in and out" with his mental health as the reason he had to stop this work. (Tr. 121).

Mr. Fowler described pain in his right knee, ranging from seven to ten on a ten-point scale, occurring both while sitting and standing. (Tr. 122-23). He could sit for twenty minutes comfortably, stand for ten minutes, walk a block, and lift five to ten pounds. (Tr. 123-24). The pain in his knee may be from a tumor. (Tr. 124). Mr. Fowler has gone to specialists regarding his knee but was unaware of next steps in his care. (Tr. 125). Mr. Fowler was given a knee brace in October, but he testified to having issues with his knee since he was twenty years old. (Tr. 131).

Mr. Fowler successfully completed a rehabilitation program at Stella Maris. (Tr. 130). He treats his depression with a case manager. (Tr. 131-32). Mr. Fowler described difficulty interacting with people, including with family members. (Tr. 132).

VE Zinsmeister then testified. She classified Mr. Fowler's past work (both positions) as correction officer, DOT 372.667-018, SVP 4, medium exertional level, but SVP 3 and light as performed. (Tr. 135).

The ALJ asked VE Zinsmeister to consider a hypothetical person of Mr. Fowler's age and education, limited to medium exertional level; frequent climbing of ladders, ropes, and scaffolds, frequently stoop. (*Id.*). She responded that hypothetical individual could perform such work as generally performed but not as actually performed. (Tr. 135-36). Representative jobs for such an individual included a store laborer (DOT 922.687-010, SVP 2, medium, 300,000 jobs in the national economy); hospital cleaner (DOT 323.687-010, SVP 2, medium, 600,000 jobs in the national economy); and kitchen helper (DOT 318.687-010, SVP 2, medium, 400,000 jobs in the national economy). (Tr. 136).

In a second hypothetical, the individual was limited to light work, occasional light foot controls, occasional climbing of ramps and stairs, never climbing ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, crawl; no exposure to unprotected heights, moving mechanical parts, or operating a motor vehicle; occasional reaching overhead with left and right, and frequent reaching in all other directions. (Tr. 136-37). Such an individual could perform the position as actually performed but not as generally performed. (Tr. 137). Representative jobs included cleaner, housekeeping (DOT 323.687-014, SVP 2, light, 150,000 jobs in the national

economy); cashier II (DOT 211.462-010, SVP 2, light, 1,100,000 jobs nationally); and delivery

marker (DOT 222.587-038, SVP 2, light, 300,000 jobs in the national economy). (*Id.*).

In a third hypothetical, the individual was further limited from the second hypothetical, to

include: limited to performing simple, routine, and repetitive tasks but not at a production-rate

pace (no assembly line work), limited to simple work-related decisions, using his judgment, dealing

with changes in the work setting, and able to frequently interact with supervisors, coworkers, and

the public. (Tr. 137). Such an individual could not perform the past work identified. (Tr. 137-38).

However, representative job included the ones previously identified (excluding the cashier

position), as well as mail clerk (DOT 209.687-026, SVP 2, light, 100,000 jobs in the national

economy).

Next, the ALJ crafted a hypothetical including the limitations from the second and third

hypotheticals, but modified the interaction with supervisors, coworkers, and the public to

occasional. (Tr. 138). The previously identified jobs from the second and third hypotheticals

would still apply, excluding the cashier position. (Tr. 138).

Finally, the VE opined that twenty percent off-task time would exceed what an employer

would tolerate in a work setting, as would two days absent every month. (Tr. 138-39). After Mr.

Fowler described his mental health limitations, the VE clarified that up to fifteen percent of off-

task behavior would be tolerated, but more than that would be work-preclusive. (Tr. 142). One

absence per month would be tolerated (including arriving late and leaving early). (*Id.*).

Mr. Fowler described feeling threatened being around people, wanting to isolate all the

time, and wanting to be alone, including from friends and relatives. (*Id.*). He described being "in

fear all the time." (*Id.*). Responding to these statements, the ALJ presented a hypothetical to the

VE to include a restriction of no public contact. (Tr. 143). The only job affected by this limitation was the cashier position. (*Id.*). Further, if the individual could have occasional interaction with supervisors but no contact with coworkers or the public, all work would be precluded. (*Id.*).

## THE ALJ'S DECISION

The ALJ's decision, dated August 27, 2020, included the following findings of fact and conclusions of law:

1.  The claimant has not engaged in substantial gainful activity since February 11, 2019, the application date (20 CFR 416.971 *et seq.*).

2.  The claimant has the following severe impairments: advanced cervical spondylosis and mild to moderate diffuse AP narrowing of the cervical spinal canal and multilevel foraminal narrowing; ganglion cyst and sclerotic changes in the right knee; unspecified schizophrenia and other psychotic disorder; depression; anxiety; and mood disorder (20 CFR 416.920(c)).

3.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except the claimant can occasionally operate right foot controls. Can occasionally reach overhead with the right and the left. Can frequently reach in all other directions with the right and the left. Can occasionally climb ramps and stairs. He can never climb ladders, ropes, or scaffolds. Can occasionally balance, stoop, kneel, crouch, and crawl. Can never be exposed to unprotected heights, moving mechanical parts, or operate a motor vehicle. Is limited to performing simple, routine, and repetitive tasks, but not at a production rate pace (i.e. assembly line work). Is limited to simple work related decisions in using his judgment and dealing with changes in the work setting. Is able to frequently interact with supervisors, coworkers, and the public.

5.  The claimant is unable to perform any past relevant work (20 CFR 416.965).

6.  The claimant was born on April 23, 1968, and was 50 years old, which is defined as an individual closely approaching advanced age, on the date the application was filed (20 CFR 416.963).

14

7.      The claimant has a limited education (20 CFR 416.964).

8.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10.     The claimant has not been under a disability, as defined in the Social Security Act, since February 11, 2019, the date the application was filed (20 CFR 416.920(g)).

(Tr. 90-99).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if

substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Social Security*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

A district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted). Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own procedures and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to

result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 416.920—to determine if a claimant is disabled:

1.  Was claimant engaged in a substantial gainful activity?

2.  Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.  Does the severe impairment meet one of the listed impairments?

4.  What is claimant's residual functional capacity and can claimant perform past relevant work?

5.  Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 416.920(b)-(f); *see also Walters,* 127 F.3d at 529.

DISCUSSION

Mr. Fowler presents three issues for review. I find none have merit and recommend the District Court affirm.

17

I.      **The ALJ's assessment of Mr. Fowler's mental residual functional capacity was supported by substantial evidence.**

Mr. Fowler first argues that his mental residual functional capacity (RFC) was "premised on an inappropriate parsing of Dr. Whitlow's findings and opinion, and as a result, is not supported by substantial evidence." (Pl.'s Br., ECF #9, PageID 708). In Mr. Fowler's view, this parsing of Dr. Whitlow's opinion was erroneous because the ALJ then "failed to include her most restrictive findings and limitations in his residual functional capacity determination." (*Id.* at PageID 708-09). As he argues, the ALJ found Dr. Whitlow's opinion persuasive, and the VE testified that if incorporated into the RFC, the limitations Dr. Whitlow specified would be work-preclusive; thus, remand is necessary. (*Id.* at PageID 709-11).

The Commissioner counters that the ALJ adequately evaluated Dr. Whitlow's opinion. (Comm'r's Br., ECF # 11, PageID 739). As the Commissioner presents, Dr. Whitlow's opinion discussed limitations Mr. Fowler "appears to have" in various functional areas; however, Dr. Whitlow does not more specifically define to what degree Mr. Fowler would be limited by his mental health impairments. (*Id.*). Thus, the ALJ noted Dr. Whitlow's opinion was "vague and non-specific" despite also finding it persuasive. (Tr. 96). Ultimately, the ALJ included some measure of restriction in each of the areas Dr. Whitlow identified as problematic for Mr. Fowler. (Comm'r's Br., ECF #11, PageID 740-41).

Upon review, I agree with the Commissioner. Mr. Fowler has not shown that the RFC did not accurately reflect the type of limitations he required and thus remand is not warranted on this basis.

Because Mr. Fowler filed for benefits on February 11, 2019, the new regulations apply. (Tr. 156). Under 20 C.F.R. § 416.920c, for claims filed on or after March 27, 2017, the ALJ is to

articulate "how persuasive [he] find[s] all of the medical opinions and all of the prior

administrative medical findings in [the] case record." 20 C.F.R. § 416.920c(b). The ALJ is not

required to defer to or give any specific evidentiary weight to a medical opinion, and is not

required to give a treating source controlling weight. *Id.* at § 416.920c(a). Instead, the ALJ must

articulate the consideration given to the medical opinions in the record, grounded in the two

"most important factors"—supportability[2] and consistency.[3] *Id.* at § 416.920c(b). The ALJ must

explain how those factors were considered, but the terms "supportability" or "consistency" need

not appear in the ALJ's analysis. *Hardy v. Comm'r of Soc. Sec.*, No. 2:20-cv-4097, 2021 WL 4059310,

*2 (S.D. Ohio Sept. 7, 2021). An ALJ "may, but [is] not required to" explain the remaining factors

of relationship with the claimant, specialization, or other factors, absent the ALJ's finding that two

opinions are "equally" persuasive. *See* 20 C.F.R. § 416.920c(b)(2)-(3).

While the regulations no longer require deference to a treating source opinion, "they still

require that the ALJ provide a coherent explanation of [his] reasoning." *Lester v. Saul*, No. 20-

01364, 2020 WL 8093313, at *14 (N.D. Ohio Dec. 11, 2020), *report and recommendation adopted*,

2021 WL 119287 (N.D. Ohio Jan. 13, 2021). And, "because of the greater latitude afforded ALJs

under the new regulations, the importance of cogent explanations is perhaps even more

important." *Hardy v. Comm'r of Soc. Sec.*, 554 F. Supp. 3d 900, 908 (E.D. Mich. 2021). Agency

---

[2]  "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his medical opinion(s) or prior administrative medical finding(s), the more persuasive the opinion(s) and finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1).

[3]  "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the opinion(s) and finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

regulations "set forth a 'minimum level of articulation' to be provided in determinations and decisions, in order to 'provide sufficient rationale for a reviewing adjudicator or court.'" *Warren I. v. Comm'r of Soc. Sec.*, No. 20-495, 2021 WL 860506, at *8 (N.D.N.Y. Mar. 8, 2021) (quoting 82 Fed. Reg. 5844-01 (2017)). An "ALJ's failure . . . to meet these minimum levels of articulation frustrates [the] court's ability to determine whether [the claimant's] disability determination was supported by substantial evidence." *Vaughn v. Comm'r of Soc. Sec.*, No. 20-1119, 2021 WL 3056108, at *11 (W.D. Tenn. July 20, 2021).

The ALJ must form an RFC appropriate to the claimant's abilities, supported by the ALJ's evaluation of the medical evidence. *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004). The RFC is to be an assessment of the claimant's remaining capacity for work, once the claimant's limitations have been considered. *Id.* at 632. An ALJ is to consider all evidence in the record to evaluate the limiting effects of the claimant's symptoms, including daily activities, the nature of the alleged symptoms, efforts made to alleviate the symptoms, the type and efficacy of treatments, and other factors regarding the claimant's functional limitations. *Avery v. Comm'r of Soc. Sec.*, No. 1:19-CV-1963, 2020 WL 2496917, at *11 (N.D. Ohio May 14, 2020). The ALJ also must determine the "extent to which the symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the individual's record." *Id.*

An ALJ's RFC assessment is to reflect the most an individual can do despite his impairments, not the optimized or best conditions for an individual's work. *See Horinek v. Saul*, No. 1:19-cv-2141, 2020 WL 4340987, *9 (N.D. Ohio Jul. 7, 2020) ("[T]he ALJ was not required to create an optimal work setting for Plaintiff. 'Optimal conditions . . . are not necessary ones.'") (quoting *Jakubiak v. Berryhill*, 337 F. Supp. 3d 80, 85-86 (D. Mass. 2018)), *report and recommendation*

20

*adopted*, 2021 WL 1571659 (N.D. Ohio Apr. 22, 2021). Therefore, the ALJ is not required to adopt all opined limitations into the RFC, even if he finds the opinion persuasive. *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 269 (6th Cir. 2015). An ALJ "is only required to incorporate those limitations which he has deemed credible" and may reject limitations or impose more restrictions. *Gant v. Comm'r of Soc. Sec.*, 372 F. App'x 582, 585 (6th Cir. 2010). However, in so doing, the ALJ must provide an explanation that allows the Court to conduct a meaningful review of the decision. *See Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011) (noting that an ALJ's decision must include a discussion of findings and conclusions, and the reasons or basis for those conclusions, on all material issues of fact, law, or discretion presented on the record).

Here, the ALJ provided the following analysis for his consideration of Dr. Whitlow's opinion:

> Consultative examiner Dr. Natalie Whitlow is found to be persuasive. They noted that the claimant appears to have limitations in his abilities and limitations in maintaining attention and concentration, and in maintaining persistence and pace to perform simple tasks and to perform multi-step tasks. He does not have debilitating limitations in abilities and limitations in responding appropriately to supervision and to coworkers in a work setting. She also opined limitations in his abilities and limitations in responding appropriately to work pressures in a work setting. While vague and non-specific, it is consistent with the record that the claimant has limitations in these areas. While exams showed anxiety and poor judgement, he had fair insight, a normal mood generally, and was able to communicate with medical staff efficiently. Additionally, Dr. Whitlow has specialty knowledge as a licensed psychologist, as well as supportability with the record.

(Tr. 96) (internal citation omitted). The ALJ found Dr. Whitlow's opinion persuasive and described its supportability and consistency as compared to the record. (*Id.*). As provided above, the ALJ found the opined limitations "vague and non-specific" but still generally found Dr. Whitlow's opinion persuasive, explaining that it was consistent with and supported by the record,

comparing it against other exam findings, and also explaining Dr. Whitlow's specialty as a licensed psychologist were all factors favoring its persuasiveness. (*Id.*). I find no reversible error on the basis of the ALJ's articulation of the persuasiveness of Dr. Whitlow's opinion.

I also find no merit to Mr. Fowler's contentions that the ALJ impermissibly "parsed the record" when crafting the RFC or that "the ALJ's RFC failed to address or include the doctor's conclusion that Mr. Fowler's impairments in maintaining mood and generalized stability, functioning in an overall capacity, and in effectively engaging in the work world." (Pl.'s Br., ECF #9, PageID 709). Dr. Whitlow provided a consultative examination to Mr. Fowler on one occasion, apparently prior to him engaging in medication-managed treatment. (*Compare* Tr. 513-22 *with* Tr. 540-73). Mr. Fowler's regular mental health records do not disclose that he was more limited than the ALJ determined. Rather, it appears that he reported "things are going well" when engaging in treatment at Stella Maris. (Tr. 573). His provider also regularly noted Mr. Fowler appeared "stable" during treatment and was compliant with his medication. (*See* Tr. 540-73). Thus, he has not shown that the ALJ ignored evidence or that the RFC does not effectively respond to his limitations. Instead, his argument appears to ask this Court to re-weigh the evidence provided by Dr. Whitlow and find him disabled, which this Court may not do.

As explained above, the RFC determination is for the ALJ alone to make, not Dr. Whitlow, the VE, or this Court. The ALJ, in his discretion, may determine what limitations are necessary to include in the RFC, and is not required to include all limitations opined by a doctor or testified by a VE. Moreover, an ALJ may find that a doctor's limitations are vague and decline to incorporate them; this does not mean that the ALJ's determination lacked substantial evidence. *See Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 122 (6th Cir. 2016) ("The record therefore supports

the ALJ's conclusion that the physical limitations that Dr. Yates placed on Dooley were vague and unsupported by the doctor's own examination notes.").

It does not appear the ALJ ignored Dr. Whitlow's opined limitations; rather, it appears that the ALJ included some restrictions in each of the functional areas Dr. Whitlow opined were necessary for Mr. Fowler.

| Functional Assessment Area | Dr. Whitlow's Opinion | ALJ Included in RFC |
|---|---|---|
| Describe the claimant's abilities and limitations in understanding, remembering, and carrying out instructions. | • The claimant does not appear to have debilitating limitations with understanding or remembering instructions<br>• The claimant appears to have limitations with carrying out instructions | Simple, routine, and repetitive tasks. |
| Describe the claimant's abilities and limitations in maintaining attention and concentration, and in maintaining persistence and pace to perform simple tasks and to perform multi-step tasks. | • The claimant appears to have limitations on this functional assessment area, which . . . impair his ability to maintain attention and concentration and mental persistence.<br>• His symptomology also causes him to experiences states of general instability that impair[s] his functioning, including his ability to follow through on and complete tasks. | Simple, routine, and repetitive tasks that cannot be performed at a production-rate pace. |
| Describe the claimant's abilities and limitations in responding appropriately to supervision and to coworkers in a work setting. | • From a mental health perspective, the claimant does not appear to have debilitating limitations on this functional assessment area.<br>• The claimant's odd and bizarre presentation . . . as well as his paranoia, could interfere with his interpersonal functioning and ability to appropriately respond to supervisors and coworkers. | Frequent interaction with supervisors, coworkers, and the public. |

| Functional Assessment Area | Dr. Whitlow's Opinion | ALJ Included in RFC |
|---|---|---|
| Describe the claimant's abilities and limitations in responding appropriately to work pressures in a work setting. | • The claimant appears to have limitations on this functional assessment area . . . that would diminish his ability to appropriately respond to work pressures related to attendance, professional presentation, reliability, task completion, and productivity, and maintaining general stability. | Simple, work-related decisions in using his judgment and dealing with changes in the work setting. |

(*Compare* Tr. 92-93, 96 *with* Tr. 521-22).

Thus, Mr. Fowler has not shown any inconsistency between Dr. Whitlow's assessment that he "appears to have limitations" and the ALJ's finding of specific limitations in those functional areas. "The burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009). And "the party seeking reversal normally must explain why the erroneous ruling caused harm." (*Id.* at 410). Mr. Fowler retains the burden of proving disability at this stage. *Walters,* 127 F.3d at 529. But he has not presented evidence that explains how the allegedly-erroneous RFC caused him harm or did not meet his mental health limitations.

I therefore decline to recommend remand on this basis.

## II. There was sufficient evidence for the ALJ to evaluate fully Mr. Fowler's physical RFC.

Mr. Fowler next argues the ALJ had insufficient evidence to reach a physical RFC determination in his case. (Pl.'s Br., ECF #9, PageID 711). Mr. Fowler contends "the ALJ slipped into the role of playing doctor since the reviewing physicians considered an incomplete record, containing none of the information after December 2018, and concluded that there was insufficient evidence to assess Mr. Fowler's claim." (*Id.* at PageID 712). Mr. Fowler relies on *Deskin*

24

*v. Comm'r of Soc. Sec.*, 605 F. Supp. 2d 908, 912 (N.D. Ohio 2008), for the proposition that "the ALJ stepped outside of his judicial role, played doctor, and relied on his interpretation of examinations, x-rays, an MRI, a CT scan, and a bone scan to determine Mr. Fowler's residual functional capacity." (Pl.'s Br., ECF #9, PageID 711-12). Mr. Fowler argues the ALJ could have satisfied his duty to fully develop the record by obtaining a consultative examination or medical expert testimony. (*Id.* at PageID 712-13).

The Commissioner agrees that ALJs have a duty to develop the record; however, the ALJ also "has discretion to determine whether additional evidence is necessary." (Comm'r's Br., ECF #11, PageID 743). Even though Mr. Fowler appeared at the hearing *pro se*, remand is not warranted on this basis. (*Id.*). And even so, the Commissioner contends the ALJ met his duty to develop the record by searching for and obtaining additional records in the period just prior to the hearing. (*Id.*). Finally, the Commissioner argues the ALJ did not "play doctor" regarding the records after December 2018, because each additional test cited was read by an interpreting radiologist or Mr. Fowler's orthopedist. (*Id.* at PageID 745). Thus, it is not "raw medical data" subject to interpretation by an ALJ playing doctor. (*Id.*).

I conclude the ALJ did not fail to develop the record or "played doctor" by reviewing treatment records and crafting an RFC after the date the agency reviewers completed their review at the initial and redetermination records.

An ALJ has a duty to "fully develop the record," particularly where a claimant appears *pro se. Lashley v. Sec'y of Health & Hum. Servs.*, 708 F.2d 1048, 1051 (6th Cir. 1983). And, "under special circumstances—when a claimant is (1) without counsel, (2) incapable of a presenting an effective case, and (3) unfamiliar with hearing procedures—an ALJ has a special, heightened duty to

develop the record." *Wilson v. Comm'r of Soc. Sec.*, 280 F. App'x 456, 459 (6th Cir. 2008) (*citing Lashley*, 708 F.2d at 1051-52). In such cases, "the ALJ has a duty to exercise a heightened level of care and assume a more active role in the proceedings." *Lashley*, 708 F.2d at 1051 (cleaned up). Whether the ALJ satisfies this heightened duty of care is determined on a case-by-case basis, *see id.*, and "the key inquiry is whether the [ALJ] fully and fairly developed the record through a conscientious probing of all relevant facts," *Rowden v. Chater*, 87 F.3d 1315, 1996 WL 294464, at *1 (6th Cir. June 3, 1996) (table).

Even if the ALJ had a "special duty" to develop the record, the ALJ "must not become a partisan and assume the role of counsel." *Lashley*, 708 F.2d at 1051. As noted by other courts in the Sixth Circuit:

> the Court of Appeals intended to impose a duty on ALJs to develop the record to the fullest extent possible *in the courtroom*, by taking extra time and extra care in questioning the claimant and other witnesses during the hearing, and by making specific requests for additional documentation, testimony, or evidence that is unavailable at the hearing, but would be helpful in rendering a decision. The Court of Appeals did not intend to impose a duty on ALJs to serve as a pro se claimant's investigator, researcher, records custodian, or advocate *outside of the courtroom*.

*Morgan v. Astrue*, No. 3:09-CV-262, 2010 WL 3723992, at *8 (E.D. Tenn. June 30, 2010), *report and recommendation adopted*, 2010 WL 3723985 (E.D. Tenn. Sept. 15, 2010).

But the Sixth Circuit has repeatedly affirmed that the claimant has the ultimate burden to prove disability. *Walters*, 127 F.3d at 529; *see also Wilson*, 280 F. App'x at 459. It is incumbent on the claimant to provide an adequate record on which the ALJ can make an informed decision regarding the claimant's disability status, *see Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986).

Contrary to Mr. Fowler's contention, the Sixth Circuit has stated that "the regulations do not require an ALJ to refer a claimant to a consultative specialist, but simply grant him the authority to do so if the existing medical sources do not contain sufficient evidence to make a determination." *Landsaw*, 803 F.2d at 214 (citing 20 C.F.R. § 416.917(a)). And a "'full inquiry' does not require a consultative examination at government expense unless the record establishes that such an examination is *necessary* to enable the administrative law judge to make the disability decision." *Id.* (quoting *Turner v. Califano*, 563 F.2d 669, 671 (5th Cir. 1977)) (emphasis in original).

An ALJ impermissibly "plays doctor" where he substitutes his knowledge for that of a physician or medical expert and interprets raw medical data. *See Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 726 (6th Cir. 2013). But "[a]n ALJ does not improperly assume the role of a medical expert by weighing the medical and non-medical evidence before rendering an RFC finding." *Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 439 (6th Cir. 2010). And an ALJ does not "interpret raw medical data" where X-rays or other records have already been interpreted by a treating physician or radiologist. *See Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 726-27 (6th Cir. 2012) (finding the ALJ did not interpret raw medical data beyond their ability where x-rays had already been read and interpreted by a radiologist, and finding the ALJ properly evaluated the evidence of the claimant's physical condition to construct an RFC and did not require the assistance of a medical expert).

It is not necessary that a non-treating source's opinion be "based on a 'complete' or 'more detailed and comprehensive' case record" in order for the ALJ to credit portions of that opinion to make the ALJ's determination. *Helm v. Comm'r of Soc. Sec. Admin.*, 405 F. Appx. 997, 1002 (6th Cir. 2011). The ALJ can reasonably credit the opinion of the State Agency physician even if the

27

physician lacks access to the entire record so long as the "conclusion that [the claimant] retained the capacity to work was supported by the totality of the medical and vocational evidence of the record." *Glasgow v. Comm'r of Soc. Sec.*, 690 F. Appx 385, 387 (6th Cir. 2017). An ALJ does not err by considering evidence postdating agency review. *See McGrew v. Comm'r of Soc. Sec.*, 343 F. Appx 26, 32 (6th Cir. 2009) (affirming the Commissioner where the ALJ considered the medical examinations conducted after agency review and took into account any relevant changes in the claimant's condition). Indeed, "the ALJ is charged with the responsibility of evaluating the medical evidence and the claimant's testimony to form an assessment of [the claimant's] residual functional capacity." *Webb*, 368 F.3d at 633 (cleaned up).

Thus, Mr. Fowler's contention that the ALJ should have called on medical expert testimony fails. The ALJ fulfilled his duty under *Lashley* and *Wilson* to develop the record without slipping into the role as counsel and balanced his role as an adjudicator of a non-adversarial process. When Mr. Fowler indicated he did not have his doctor's information or medical records, the hearing office obtained additional records necessary prior to the hearing. (*See* Tr. 414; *see also* Tr. 530-665). The ALJ developed the record within his courtroom by pausing to explain the process where Mr. Fowler was unfamiliar, and by posing additional questions to the VE when Mr. Fowler expressed the limitations caused by his mental health condition. (*See* Tr. 141-43). Finally, the ALJ did not "play doctor" by considering the full record, and any records considered were not "raw medical data" but had already been interpreted by treating physicians or other qualified medical professionals. Furthermore, it is within the ALJ's discretion to determine whether additional expert advice is necessary to make a determination.

Therefore, I find no reason to recommend remand on this basis.

**III.     Post-hearing evidence does not warrant remand.**

Finally, Mr. Fowler requests a Sentence Six remand, arguing that new and material evidence requires remand, and asserts that he had good cause for failing to incorporate the additional evidence into the record during the administrative process. (Pl.'s Br., ECF # 9, PageID 713). Specifically, Mr. Fowler argues the records from Lutheran Hospital and Cleveland Clinic demonstrate tenderness in his cervical and upper thoracic paraspinal muscles, as well as left cervical radiculopathy, left arm weakness, numbness, and mechanical low back pain. (*Id.* at 714). He argues there is a reasonable probability the ALJ would have reached a different conclusion, because, based on this evidence, Mr. Fowler would require further restrictions to his RFC. (*Id.* at 715).

The Commissioner contends the evidence at issue does not meet the standards for Sentence Six remand. (Comm'r's Br., ECF #11, PageID 745-48). The Appeals Council considered the records at issue, but nonetheless determined the evidence would not affect or change the outcome of the decision of whether Mr. Fowler was disabled on August 27, 2020, the date the ALJ issued his decision. (*Id.* at 747-48; *see also* Tr. 2).[4]

I agree with the Commissioner's assessment.

---

[4]        In arguing against Sentence Six remand, the Commissioner also suggests:

> If Plaintiff's impairments worsened after the ALJ's decision, the appropriate course is to file a new claim, not demand remand of the old one. *See Martin v. Comm'r of Soc. Sec.*, No. 3:13CV1166, 2014 WL 2114690, at *4 (N.D. Ohio May 20, 2014) ("Where documents generated after the ALJ's decision relate to a worsening of the claimant's impairment and limitations after the decision date, the claimant should ordinarily file a new claim rather than seek a remand to reconsider the old one.").

(Comm'r's Br., ECF #11, PageID 747). I express no opinion on this issue.

Under Sentence Six of 42 U.S.C. § 405(g), the District Court does not affirm, modify, or reverse the Commissioner's decision; it does not rule in any way as to the correctness of the administrative determination. *Melkonyan v. Sullivan*, 501 U.S. 89 (1991); *Cross v. Comm'r of Soc. Sec.*, 373 F.Supp.2d 724, 734 (N.D. Ohio 2005) ("'Sentence six' of 42 U.S.C. § 405(g) permits a reviewing court to remand, without ruling on the merits."). If a Sentence Six remand is ordered, the District Court retains jurisdiction while the matter is remanded to the Social Security Administration for further proceedings; it is not a final judgment that can be appealed. *Melkonyan*, 501 U.S. 89; *Cross*, 373 F.Supp.2d 724; *Wasik v. Comm'r of Soc. Sec.*, No. 09–14933, 2011 WL 740686 (E.D.Mich. 2011). A claimant must establish two prerequisites before a district court may order a Sentence Six remand. *Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 484 (6th Cir. 2001). A claimant must show: (i) the evidence at issue is both "new" and "material"; and (ii) there is "good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g); *see also Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996). The party seeking remand bears the burden of meeting these two requirements. *See Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001).

The Sixth Circuit explained "evidence is new only if it was not in existence or available to the claimant at the time of the administrative proceeding." *Foster*, 279 F.3d at 357. Such evidence, in turn, is deemed "material" if "there is a probability that the [Commissioner] would have reached a different disposition of the disability claim if presented with new evidence." *Id.* However, "evidence that demonstrates a [claimant's] deteriorating condition is not relevant to a remand determination under Sentence Six." *Wasik*, 2011 WL 740686, *6. Moreover, "[r]ecords that show a lack of improvement, which were created after the ALJ's disability determination, cannot be used

to show disability existed at the time of the disability determination." *Id.* Evidence of the

aggravation or deterioration of a condition is not relevant because "it does not demonstrate the

point in time that the disability itself began." *Guy v. Comm'r of Soc. Sec.*, No. 11-12828, 2013 WL

1148413, *11 (E.D. Mich. 2013) (quotation omitted).

I agree with the Appeals Council's review of the physical records at issue here.[5] Mr. Fowler

is not entitled to a remand under Sentence Six.

The Appeals Council found that the Lutheran Hospital and Cleveland Clinic records from

October and November 2020 did not relate to the period at issue and do not affect the decision

about whether Mr. Fowler was disabled beginning on or before the ALJ's decision on August 27,

2020. (Tr. 2). The Lutheran Hospital records (Tr. 14-27) showed tenderness to the cervical and

upper thoracic paraspinal muscles based on an examination from October 21, 2020; Mr. Fowler

was recommended to alternate ice and heat and take prescriptions for Lidoderm, naproxen,

prednisone, and Zanaflex; follow-up was necessary if symptoms persisted or worsened. (Tr. 22-23).

The Cleveland Clinic records (Tr. 28-40) relate to examinations on October 28 and

November 4, 2020. (*See* Tr. 45, 24-25, 27, 35, 39). On October 28th, Dr. Reddy provided a

provisional diagnosis of acute left cervical radiculopathy at C6/7 with left arm weakness,

numbness, and mechanical low back pain. (Tr. 39). X-rays from that date showed narrowing in the

C-spine and in the L5-S1 disc space. (Tr. 33, 35). On November 4th, Mr. Fowler presented to the

---

[5]     Additional physical health records from Lutheran Hospital dated December 22, 2019, and mental health records from Centers for Families and Children were also obtained after the hearing. (*See* Tr. 13-14, 41-79). However, Mr. Fowler only requests remand for consideration of the physical health records from Lutheran Hospital and Cleveland Clinic Foundation dated, respectively, October 21, October 28, and November 4, 2020. (*See* Pl.'s Br., ECF #9, PageID 713-15). I therefore do not address whether remand is necessary for consideration of the other evidence considered and rejected by the Appeals Council. (*See* Tr. 2).

Cleveland Clinic emergency department complaining of neck and thoracic back pain with radiation to his left arm. (Tr. 24). Examination was positive for back and neck pain, and 2+ radial pulses bilaterally, negative for arthralgias and myalgias. (Tr. 24-25). X-rays of Mr. Fowler's left shoulder demonstrated left acromioclavicular joint arthrosis but no acute bony abnormality. (Tr. 15). Mr. Fowler was discharged with prescriptions for Mobic, Voltaren topical gel, and Norflex. (Tr. 27).

First, these records appear somewhat duplicative of his complaints of neck and back pain found elsewhere in the record. (*See* Tr. 446, 481, 588, 594). While they may suggest a worsening of his condition, they do not provide additional clarity as to Mr. Fowler's physical limitations, and thus, do not show a reasonable probability that the ALJ's decision would change as a result. Further, the records do not appear to be material to this determination because they do not relate back to the period at issue. Presenting records from the Cleveland Clinic reflect Mr. Fowler had complained of "pain for the past 2 weeks" after having "a crick in his neck" (Tr. 24) and records from Lutheran Hospital note upper back and neck pain starting four days prior. (Tr. 21).

I conclude that Sentence Six remand is not warranted.

CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I

recommend the District Court **AFFIRM** the Commissioner's decision denying supplemental

security income .

Dated: August 9, 2022

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

OBJECTIONS, REVIEW, AND APPEAL

**Within 14 days after being served with a copy of this Report and
Recommendation, a party may serve and file specific written objections to the
proposed findings and recommendations of the Magistrate Judge.** *See* **Fed. R.
Civ. P. 72(b)(2);** *see also* **28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly
asserted objections shall be reviewed de novo by the assigned district judge.**

**Failure to file objections within the specified time may result in the forfeiture or
waiver of the right to raise the issue on appeal, either to the district judge or in a
subsequent appeal to the United States Court of Appeals, depending on how or
whether the party responds to the Report and Recommendation.** *Berkshire v.
Dahl,* **928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not
merely indicate a general objection to the entirety of the Report and
Recommendation; "a general objection has the same effect as would a failure to
object."** *Howard v. Sec'y of Health and Hum. Servs.,* **932 F.2d 505, 509 (6th Cir.
1991). Objections should focus on specific concerns and not merely restate the
arguments in briefs submitted to the Magistrate Judge. "A reexamination of the
exact same argument that was presented to the Magistrate Judge without specific
objections 'wastes judicial resources rather than saving them and runs contrary to
the purpose of the Magistrates Act.'"** *Overholt v. Green,* **No. 1:17-CV-00186,
2018 WL 3018175, at \*2 (W.D. Ky. June 15, 2018) (quoting** *Howard,* **932 F.2d at
509). The failure to assert specific objections may in rare cases be excused in the
interest of justice.** *See United States v. Wandahsega,* **924 F.3d 868, 878-79 (6th
Cir. 2019).**